JOSEPH HERMAN

*vs.*

NETTIE A. GREENE & TRUSTEE.

PETER NELKIN ET AL.

*vs.*

NETTIE A. GREENE & TRUSTEE.

Cumberland.   Opinion, September 20, 1943.

*Berman & Berman, Portland,*

*Sidney W. Wernick,* for the plaintiffs.

*Merrill & Merrill,*

*Harvey D. Eaton,* for the defendants.

SITTING: STURGIS, C.J., THAXTER, MANSER, MURCHIE, JJ.

THAXTER, J. We are concerned here with two actions brought by different plaintiffs against the same defendant to recover on two promissory notes. In each case an exception was taken to the refusal of the presiding justice to direct a verdict for the plaintiff, and after a verdict for the defendant a general motion for a new trial was filed in each. By filing these motions the plaintiffs waived their exceptions as both the exceptions and the motions raise the same issue. We shall therefore consider only the motions.

Each note was made payable to Maurice L. Diamond and Mabel S. Early and for the same principal sum, $2,925.00, although this circumstance happens to be a mere coincidence. In the action brought by Herman the note was dated February 7, 1942 and was payable May 10, 1942 at the Federal Trust Company of Waterville, Me. In the other case the note was dated March 10, 1942 and was due May 15, 1942. In all other respects it was similar to the first. The notes were endorsed by the payees and by one Sam Diamond, a brother of Maurice, and were held by the respective plaintiffs as endorsees of Sam Diamond. The defendant does not deny having signed the notes but claims that her signature in each instance was obtained by fraud of which the endorsee, Sam Diamond, and likewise the plaintiffs had notice. It is set forth in the defendant's amended brief statement in the Herman case that Maurice L. Diamond and Mabel S. Early in May, 1941, persuaded the defendant to make a loan of $5,000.00 to a corporation known as Stewart's Inc. of which they were respectively the president

and the secretary; that for the loan of $5,000.00 they gave to the defendant a note of the corporation endorsed by them dated May 3, 1941, for the sum of $6,000.00 payable May 1, 1942; that on February 7, 1942 the defendant secured of Stewart's Inc. certain jewelry of the alleged value of $2,925.00 which sum it was agreed should be credited as part payment on the note of $6,000.00; that the said note being then in the defendant's safe deposit box in Waterville, Maine, it was agreed that the defendant should give a receipt for the value of the jewelry; that she signed the note which is the subject-matter of the suit because of the false and fraudulent representations of Maurice L. Diamond and Mabel S. Early that she was signing merely a receipt in the sum of $2,925.00, being the agreed value of the diamonds, which was to be treated as part payment on the note of $6,000.00, and that she reasonably believed that she was signing such receipt and not a promissory note.

The allegations in the brief statement with respect to the second note dated March 10, 1942 are identical.

The defendant was a widow who appears to have been possessed of a considerable amount of spare money and spare time both of which seem to have been used very unwisely. She had spent several winters in St. Petersburg, Florida. There she met Maurice Diamond and Mabel Early who conducted a diamond auction business under the name of Stewart's Inc. She had a friend by the name of William Ferguson, who was a guest at the hotel. The defendant, Ferguson, Diamond, and Mabel Early were much in each other's company. Diamond and Mabel Early invited them to dinners, took them out for automobile rides, and all four went to the dog races together. There were dances, birthday parties and New Year parties. Ferguson testified that he regarded Diamond as a fine man and still thought so at the time of the trial. Out of all these hours spent in inconsequential fun making their relationship became so close that Ferguson finally came to regard Diamond "just like a brother." During the daytime when the

dances were not in full swing and the dogs quite probably were resting for their next race, Ferguson and Mrs. Greene would attend the diamond auctions at Stewart's. It was just for fun and the auctioneer "was very comical." Such was the tawdry background of what finally blossomed into a business relationship. Diamond had a use for money in his business and Mrs. Greene had the money. She loaned to the corporation $5,000.00 taking therefor the note of $6,000.00 referred to in the brief statement. Six months later she loaned Diamond $2,000.00. Then from being for the most part of the season a spectator at the auctions she became an active bidder. On February 7, 1942 she purchased for $5,600.00 a bracelet and on March 10, 1942 a diamond ring for $4,400.00. In each instance she turned in in part payment other jewelry which she had previously bought and in each case the balance which she owed amounted to $2,925.00. The plaintiffs claim that she signed the two promissory notes for these amounts with the full knowledge of what she was signing and that her assertion that the payees or either of them led her to believe that these were receipts for amounts to be credited on the $6,000.00 note was false.

The defendant had the burden of establishing by clear and convincing proof that her signature on each of the notes in question was obtained by fraud. *Portland Morris Plan Bank* v. *Winckler,* 127 Me., 306, 143 A., 173. The jury has decided that she has sustained that burden. The question before this court on the general motions is whether that finding is clearly and manifestly wrong. If it is, all discussion as to whether the plaintiffs were holders in due course becomes superfluous.

The claim of the defendant, apparently with respect to the Herman note, is not that any trick was practiced on her by which one piece of paper was substituted for another when she signed. Although this particular allegation was set up in the brief statement, it was abandoned when she was called on to testify. She testified that after her successful bid for the jewelry, Maurice Diamond asked her to go into the back room

or office with him to sign a receipt, that she sat down there on one side of the desk or table, that he sat down on the other side, that he passed her a paper which she took and signed. She was not hurried and apparently had ample opportunity to have read it had she wished. The paper which she admits she signed is of the following tenor:

"N. P.                                                    62658
    1-30
$2925.00                                    February 7th., 1942
    On May the 10th. 1942 after date I promise to pay to the order of Maurice L. Diamond and Mabel S. Early
    Twenty nine hundred & twenty-five & . . . . No/100
Dollars
at The Federal Trust Co., of Waterville, Maine.
Value received
                                    Nettie A. Greene
No.          Due 5/10/42"

She appears as the maker of a promissory note which she now says she had no intention of signing and was not supposed to sign. Realizing that some explanation was necessary under the circumstances, she put forth several versions of what happened, each, unfortunately for her, inconsistent with the other. In the first place she said that she signed merely a blank piece of paper, apparently intending to imply that she left it with Maurice Diamond to fill in and that he wrote in a promise on her part to pay money instead of an acknowledgment of a payment of money received by her. But this theory of what occurred had to be discarded by her when she was faced with the note which we now have before us. Obviously she did not sign a blank piece of paper. The words "after date," "promise to pay to the order of," "Dollars at," and "Value received" as well as "No." and "Due" at the bottom were printed. It was the ordinary printed form of a promissory note used in com-

mercial transactions. Finally forced to admit that these words must have been on the note when she signed it, she then first said that she read it but doesn't remember what was on it, and finally asks us to believe that she signed it without reading it at all, relying on Mr. Diamond's assurance that it was a receipt. There is nothing in what took place at the time of the signing to indicate any duress, any subterfuge, any attempt to conceal from her the writing on the particular paper which she signed. It was passed to her as she sat across the table from Mr. Diamond. All that she claims is that he told her it was a receipt. Would he attempt to deceive her as to its tenor and still furnish her with a full opportunity to read what was on it? As a matter of fact unless she signed it with her eyes shut, it is difficult to believe that she could have helped seeing what it was. That such a series of improbabilities could have happened once seems incredible. But we are asked to believe that exactly the same sequences of events followed a second time, when a month later she made a second purchase of jewelry, went into the same back office alone with Maurice Diamond, sat down at the selfsame table, was handed another note by Diamond, was given full time to read what she signed, and was told by him it was a receipt, and then that she signed it in that belief. Then we have, applicable to this transaction as to the first, her inconsistent versions of what she really did, firstly that the paper which she signed was blank, secondly that she didn't remember what was on it, and thirdly that she didn't in fact read it at all. Counsel do not tell us on which story of the defendant they intend to rely. Out of all the incredible story of what took place we are left with the suspicion that a fraud of some kind may have been practiced on the defendant but we can only guess at what may have happened. Conjecture does not take the place of proof. That some fraud may have been perpetrated is beside the point, if it is not the fraud which the defendant alleges and attempts to substantiate by proof.

The defendant had little conception of the value of money

or of its proper use. She certainly was no financial genius, as her friend Mr. Ferguson admits. But she was not quite the simpleton that she would have this court believe. She had received promissory notes for money which she had loaned. She knew what they looked like and she must have known that the words "promise to pay" were not the ones used in a receipt given for money to be credited to a debtor.

Counsel argue that the evidence is conflicting as to what took place at the time the notes were signed. The conflict is between the testimony of Sam Diamond and the defendant. Sam Diamond says that he was in the room when the notes were signed and that Mrs. Greene discussed the terms of at least one of the notes with Maurice Diamond before she signed it and mentioned the bank at which it should be made payable. But the fact that there is a conflict in the evidence does not make out a case, if the testimony on which a party relies is itself incredible. We can utterly disregard Sam Diamond's testimony and still the defendant fails.

Counsel for the defendant also calls our attention to Mrs. Greene's testimony that, after the second purchase when she came out of the back office with Maurice Diamond, he said to Mrs. Early: "We have Mrs. Greene almost paid up." If there were some independent, credible evidence that Mrs. Greene had signed a receipt or was led to believe by Diamond that she had done so, this evidence might carry some weight as corroboration. But without that, it proves nothing and is not necessarily inconsistent with the theory that Mrs. Greene signed a note which was to be used as a set-off against the note of Stewart's Inc. held by her.

There is an analogy between this case and *Strout* v. *Lewis*, 104 Me., 65, 71 A., 137. The action there was assumpsit on a written contract the terms of which were filled in on a printed form. The defense was that the defendant had been induced to sign it by the plaintiff representing to her that it was in fact something different from what its provisions expressed. The

case was tried before a jury who returned a verdict for the defendant. In sustaining a motion by the plaintiff for a new trial, the court said, page 67, with respect to the allegation of fraud: "The charge is a serious one and the law imposes on the defendant the burden of substantiating it by clear and convincing proof." Then as to the defendant's claim that she signed the paper without reading it, relying on the plaintiff's statement as to its contents, the court said page 68: "The inherent improbability of the defendant's version strikes one forcibly. She was a woman of mature years and of intelligence and it is highly improbable that she would have signed a contract with a comparative stranger without first learning its contents either by reading it herself or having it read to her."

Regardless of any conflict between the defendant's testimony and that of Sam Diamond and of the fact that neither Maurice Diamond nor Mrs. Early saw fit to testify, the burden was still on the defendant to prove fraud by evidence which it is possible to believe. We have nothing on the point but her own testimony. She gives us one version one minute and when faced with facts which cannot be controverted offers another explanation utterly inconsistent with the first, and neither of which can be accepted by reasonable men or women. This case as well as *Strout* v. *Lewis*, supra, show us that there are limits beyond which a jury may not go to save people from the consequences of their own folly. The verdicts are clearly and manifestly wrong.

*Motions sustained.*
*New trials granted.*